## TEXAS EMPLOYERS' INS. ASS'N v. HARBUCK et al.

### No. 2570.

Court of Civil Appeals of Texas. Beaumont.

May 22, 1934.

Rehearing Denied June 20, 1934.

A. L. Calhoun and David C. Marcus, both of Beaumont, for appellant.

Sanders & McLeroy, of Center, for appellees.

O'QUINN, Justice.

Appellant brought this suit in the district court of Jasper county to set aside an award of the Industrial Accident Board made on June 1, 1933, awarding compensation to appellees, Mrs. Harbuck and her two minor children, which they claimed by reason of the death of her husband, J. S. Harbuck, Jr., from injuries alleged to have been received by him on January 14, 1933, while in the course of his employment as an employee of the Stanard-Tilton Milling Company.

Appellees answered and by cross-action sought to recover compensation from appellant. The allegations of their cross-petition were appropriate and full.

The case was tried to the court without a jury, and judgment rendered in favor of appellees for $6,117.30 in a lump sum, being compensation for 360 weeks at the rate of $20 per week, less the regular discount of 6 per cent. The judgment awarded one-third of the recovery to appellees' attorneys, and one-half of the remaining two-thirds to Mrs. Harbuck, and one-half to the minor children. From that judgment appellant brings this appeal.

Appellant's first, third, and fifth assignments of error urge that the undisputed facts show that at the time of receiving his injuries J. S. Harbuck, the deceased, was not engaged in the performance of his employer's business, and so the injuries were not sustained in the course of his employment, and not compensable.

The evidence is practically without dispute. J. S. Harbuck was a traveling salesman in the employment of the Stanard-Tilton Milling Company of Dallas, Tex., selling flour. His territory covered some twenty counties in southeast Texas. His headquarters were at Lufkin in Angelina county where he resided with his wife and the two minor children, appellees herein. He was required to make or cover this territory regularly, every few weeks. His contract gave him the right to select his routes and times in which to cover the territory. He made Beaumont, Port Arthur, Orange, Livingston, Lufkin, San Augustine, Woodville, Jasper, Newton, Kirbyville, and other places. He would usually leave home Monday morning and return home Saturday night. He was required to make out a weekly route card and furnish same to his employer showing where he would be on each day of the week, and the places where he would be at night. He made his selections of towns in his territory that he would work, and the times when he would do so. This was in accordance with his contract with the milling company. This procedure was not varied unless at the special request of his employer for special purposes. His territory was so large and the towns visited so far apart that it was not possible for him to cover the territory and spend the nights at home in Lufkin. He was compelled to spend most of the nights at places in his territory, which was understood and agreed to by his employer, it furnishing him a car in which to travel and money to cover traveling expenses, including hotel bills. His employer furnished him with order blanks, order books, samples of goods, which he was expected to preserve, and he was required to keep a record at all times available of the business of his territory, and was expected to vigilantly promote and increase the business of his employer. He was authorized to and did pre-

sent and collect accounts due the milling company and made report of and remitted same to his said employer.

On the night of December 30, 1932, Harbuck was in the town of Kirbyville, having gone there in the furtherance of his employer's business. He registered—stopped—at the Chambers Hotel for the night. The hotel was a two-story wooden building. At about 2:30 a. m. the hotel was found to be burning. Harbuck could not get out by the stairway because of the fire and, in endeavoring to escape through a window, in some manner fell and was seriously injured from which he died January 14, 1933. At the time Harbuck had with him in his room his suitcase containing his order blanks, orders, order book, samples, and some money furnished him by his employer for expenses, and a check for $28 payable to the milling company which he had collected that day. He was receiving pay at the rate of $175 per month, and had been so working for more than a year prior to receiving his injuries.

J. H. Montgomery was a guest at the hotel and occupied an adjoining room upstairs to Harbuck. He awoke to find the hotel burning and gave the alarm. He heard Harbuck moving about in his room. He, Montgomery, left his room by the stairway, and some three or four minutes afterwards Harbuck swung down from the window of his room. In striking the ground he was severely injured from which he died. In a few minutes after he fell he was discovered and removed out of reach of the burning building and a doctor summoned who reached him in a few minutes. Harbuck was suffering intensely from pain and told the doctor that his delay in leaving his room was caused by him groping around in his room to secure and save the property of his employer—that is the order blanks, order book, samples of goods, the money he had with him for expenses, and the check he had that day collected. That the room was in darkness, the electric wires having probably burned in two. The statement to the doctor was made within some thirty minutes after his fall from the window.

Under these facts, considered in connection with the nature of his contract with the milling company, we think that Harbuck was clearly in the discharge of his master's business at the time he received his injuries, and therefore the injuries were sustained in the course of his employment, and so compensable. The largeness of the territory he had to cover in serving his employer made it impossible for him to spend his nights at his home at Lufkin. He had to spend practically all the week nights at places in his territory. This was recognized and agreed to by his employer. The contract not only contemplated this very thing, but provided that Harbuck's employer furnish him with funds to meet hotel bills. Harbuck's contract permitted him to select his route over his territory, the times of his covering same, and the places where he would spend the nights. Every act done by Harbuck was strictly within the terms of his contract with his employer and in line with what his employer had authorized and expected him to do.

We think it would be too narrow an interpretation of the Workmen's Compensation Act (Vernon's Ann. Civ. St. art. 8306 et seq.), and not within either the intent or spirit of the law, to say that where one, under a contract with his employer contemplating and providing for the very thing done by the employee, while journeying in the furtherance of his employer's business, strictly in line with the understood and agreed manner in which the employee was to further said business, that because the employee stops at a hotel and goes to bed and to sleep, and fire, a hazard known to all persons that attaches to wooden buildings, occurs, and in escaping from the burning building the employee is injured, that he is not entitled to compensation because he was not at that very instant busy in pursuit of his master's business. To hold thus would be contrary to the well-established rule that the law shall be liberally construed in order to give the relief intended, and in the instant case directly contrary to the express contract between the employee and his employer. The law, in instances such as here involved, does not require that the employee shall day and night be on his feet and actively engaged in following his master's business when and everywhere the employee, under his contract with his employer, must go in the pursuit of the employer's business. Harbuck's stopping at the hotel was an act necessary, in view of the nature and extent of his master's business, to carry out the matters intrusted to him, and his stopping at the hotel on the occasion in question was not a stepping aside from his employer's business for his own individual pleasure or comfort, but was the availing by him of a place furnished and paid for by the employer for his necessity in the performance of his work for his employer. Therefore Harbuck's injuries received on the occasion had to do with and originated in the business of his employer, and were sustained in the course of his employment.

Stansberry v. Monitor Stove Co., 150 Minn. 1, 183 N. W. 977, 20 A. L. R. 316, involved very similar facts, and the identical question of law. In that case Stansberry was a traveling salesman in the employ of the Monitor Stove Company. As such, he was obliged to stop at hotels in· the course of his travels, and to furnish his employer a list of the cities on his itinerary and the names of the hotels at which he would stop and when, and it was his duty to carry out such schedule. While stopping at a hotel in his territory, fire broke out in the hotel and in attempting to escape he was killed. In holding that his injury arose out of and in the course of his employment and was compensable, the Supreme Court of Minnesota said (quoting from the syllabus):

"Where a traveling salesman, obliged to stop at hotels in the course of his travel and to furnish his employer with a list of the cities on his itinerary, the names of the hotels at which he is to stop and the time he is to be at each hotel, is killed while attempting to escape during a fire in one of such hotels in which he is stopping, compensation may be recovered."

Harivel v. Hall-Thompson Co., 98 Conn. 753, 120 A. 603, is another case on all fours as to the facts and the question here for decision. There Harivel was a traveling salesman in Richmond, Va., and surrounding territory, and in the employment of the Hall-Thompson Company, whose place of business was in Hartford, Conn., upon a contract of employment providing for a payment of a weekly salary and commissions and expenses including transportation, hotel bills, etc. His employment required him to stay in hotels when making his territory. While in the Lexington Hotel in Richmond and occupying a room on the third floor, the hotel caught fire at night, and, other avenues of escape being cut off, he attempted to escape by a wire, which broke, causing him to fall and suffer injuries for which he·sought compensation. In holding the injury compensable, the Supreme Court of Connecticut held (quoting from the syllabus):

"Where a traveling salesman working under a contract providing for payment of a weekly salary and commissions, transportation, and hotel bills went to a hotel for lodgings and was injured in attempting to escape when the hotel caught fire at night, held, that the injury was one 'arising out of and in course of employment,' there being a causal connection between the injury and the employment, and the injury having occurred within the period of employment at a place where he reasonably might be while reasonably fulfilling his duties."

Not so identical as to the facts, but announcing the same principle of law, are:

In Re Bollman, 73 Ind. App. 46, 126 N. E. 639, it was held that where a thresher's engineer, under the terms of his employment was required to travel from farm to farm and to stay of nights on the premises on which the threshing outfit happened to be, was killed when a wagon bed suspended by ropes fell upon him after he had retired for the night in the driveway of a barn upon the premises, his death was by accident arising out of his employment, and was compensable.

In Haddock v. Edgewater Steel Co., 263 Pa. 120, 106 A. 196, 197, the Supreme Court of Pennsylvania held that where a mechanical engineer, employed on a salary with no fixed hours of service, had been directed by his employer to go to another city for information for use in the employer's business, and who on his return, after 11:30 p. m. and while going from the station to his home before reporting to his employer, was killed by an automobile, was injured in the course of his employment. The court said:

"This is not the case of an employee injured, after regular working hours, on the way to his home; and we agree with the court below that there is nothing upon the record to show Haddock had, at the time of the accident, 'ceased to be active in the furtherance of his employer's business.' True, the facts as found indicate that plaintiff's husband intended stopping at his own residence, to sleep for the night, before reporting the results of his trip of investigation to the president of the defendant corporation; but, none the less, he was still upon his employer's errand and, in that sense, actually engaged in the furtherance of the latter's business or affairs. Since deceased was compelled to return to the city at an hour when he could not at once communicate with his superior, and had to stay somewhere until he could report, he cannot be charged with a departure from his employer's service because, when hurt, he was going to his home for a lodging, rather than to an hotel; hence the findings of the referee are ample to sustain the ultimate conclusion upon which the award of compensation rests, to the effect that plaintiff's husband met his death by accident during the course of his employment with the defendant company."

In State ex rel. McCarthy Bros. Co. v. Dist.

Court, 141 Minn. 61, 169 N. W. 274, A. A. Von Hagen was a traveling salesman in the employ of McCarthy Bros. Company selling grain. He received a salary and traveling expenses. It was left to his judgment as to how and where he might travel. While on his way home from his field of travel on Sunday morning, he was accidentally drowned while attempting to cross the Missouri river in a boat to catch a train. The railway and bridge across the river could not be used because of flood waters. He and three other traveling men hired a boat and two helpers to get over. Before reaching the main waters of the river, they concluded that the current and wind were too strong for them to safely proceed further, and tried to turn the boat and go back. The boat came in contact with the top of a wire fence and turned over and he was drowned. The Supreme Court of Minnesota held, under these facts, that the drowning arose out of and was incidental to his employment and compensation should be allowed.

In Foley v. Home Rubber Co., 89 N. J. Law, 474, 99 A. 624; Id., 91 N. J. Law, 323, 102 A. 1053, Foley was a special traveling salesman of the Home Rubber Company, and in charge of its European trade. The company had an office in London. It became necessary for him to go to London, and he took passage upon the steamship Lusitania, which was torpedoed and sunk en route, and Foley was drowned. The Supreme Court and Court of Errors and Appeals, the highest courts in New Jersey, held that his death was incidental to, arose out of, and was suffered in the course of his employment, and therefore compensable. Foley was occupying his room on the ship as his temporary home or place to stay furnished by his employer while traveling in the furtherance of his employer's business.

Numerous decisions could be cited affirming the principle involved.

Appellant cites us, among others, to the cases of Wynn v. Southern Surety Company (Tex. Civ. App.) 26 S.W.(2d) 691; Southern Casualty Co. v. Ehlers (Tex. Civ. App.) 14 S. W.(2d) 111; and Ætna Life Ins. Co. v. Burnett (Tex. Com. App.) 283 S. W. 783, upon which it seems mainly to rely for a reversal of the judgment. We think each of these cases is easily distinguished on the facts.

In the Wynn Case, Wynn was working for the Laney Creamery Company, Inc., of San Antonio, in the capacity of a field man, his duties being to visit creameries in a territory extending over a large section of Texas.

His employment required him to not only visit the creameries and solicit business, but to assist in establishing new creameries. He was on a salary of $125 a month and expenses, and was furnished an automobile in which to make his territory. His trips to the northern portion of his territory, which embraced Waco, kept him from the office about two weeks. On March 5th, he worked the territory around Cameron and Lott, south of Waco. Saturday, March 6th, he worked McGregor west of Waco and then came to Waco and registered at the hotel. He wrote the Laney Creamery Company on said date that the roads were extremely bad by reason of heavy rains, but that he hoped by the following Tuesday to be able to go to Hamilton county on business for the company. There were two customers in Waco that he expected to see while there, the M-B Ise Kream Company and the Purity Ice Cream Company. On Saturday afternoon he called the M-B Ise Kream Company to ascertain if it would be open on Sunday, and was told it would be. Under the terms of his employment, Wynn was, when necessary, expected to work on Sunday and see prospective customers. From his letter it appears he expected to have Sunday and Monday on his hands and nothing to do. The facts in the case do not show what Wynn did or where he was until 6:30 Sunday afternoon, March 7th, at which time he went to a restaurant on South Sixth street in the city of Waco for his evening meal. After this meal he walked about 100 feet to Austin avenue, the main street in the city, and attempted to cross Sixth street, going toward the hotel where he was registered, and in attempting to cross the street he was struck by an automobile and killed.

There was no evidence that Wynn called on either the M-B Ise Kream Company or the Purity Ice Cream Company on Sunday, or that he did any other act during said day of any kind or character. What he did from the time he registered on Saturday until he appeared at the restaurant for a meal at 6:30 Sunday evening does not appear. It was not even shown that meals could not have been had at the hotel, necessitating his going out for them, nor that he occupied his room Saturday night, or whether he spent Saturday night and Sunday in pursuit of personal pleasure and diversion. It was certain that he did not call to see either of the mentioned customers although he had ascertained that at least one of them would be open to receive him on Sunday. Where he had been and what he had been doing

from the time he registered at the hotel on Saturday, or where he was going and for what purpose at the time he was killed, were left to pure conjecture. The burden of showing that at the time of receiving his injury and death he was in the performance of some duty he owed to his employer, rested upon the claimant, and failing to meet this burden recovery could not be had.

Not so in the instant case. It appears without dispute that at the time of the injury deceased was doing the very thing which, in the performance of duties as provided by his contract, he should have done and was expected by his employer to do, occupying the place of rest, his room in the hotel, contemplated and paid for by his employer. The facts in the instant case are vastly different from the facts in the cited case, and our holding here is not in conflict with the holding in that case.

In the Ehlers Case, Ehlers was a young unmarried man and living with his parents at Orange Grove. He was in the employment of the Jackson Motor Company at Sinton as an automobile salesman in an undefined territory in San Patricio and nearby counties. He was under no restrictions as to the time, place, or manner of doing his work for which he was employed, seeking his customers when and where he pleased, and making his sales and deliveries with like freedom.

He had effected the sale of two trucks to customers residing in or near Orange Grove. He went to Sinton, obtained two trucks from his employer, and with other drivers set out to deliver them on April 19, 1926. They reached Orange Grove too late to make delivery on that day. One of the trucks was left at his home for the night, and the other at a nearby filling station, to be delivered to the purchasers, probably on the next day. That night he went to a dance at Skidmore, a town twenty-two miles from Orange Grove, as was his habit to attend such functions whenever they occurred within his reach. He attended this dance, however, with the additional purpose of making sales, if possible, to two "prospects" in Skidmore. He drove to Skidmore in his coupé, which he used for demonstration purposes. He found the "prospects," drove around with one of them, demonstrating his car until about 10:30, finishing up at the dance. There he met the other "prospect," and tried to make a sale to him. This interview ended at about 11 o'clock and then he devoted the remainder of his time to the pleasures of the occasion until the dance ended at midnight or a little

later. He then set out for home at Orange Grove, accompanied in his car by a friend. On the way his car collided with an apparently abandoned "trailer" of another car, and he was seriously injured. Recovery was denied. But for his stepping aside from pursuing his duties as salesman, to engage in the pleasures of the dance, solely for his personal diversion and entertainment, and in no wise relating to the discharge of the duties of his employment, but entirely foreign thereto, he would have been entitled to compensation.

The facts in the instant case show no such stepping aside. Every act of Harbuck was in line with his performance of duty to his employer, in the manner and at the time and place where he received his injuries. There is no conflict in our holding here and that in the cited case.

In the Burnett Case, Burnett was in the employ of the Calumet Baking Powder Company, as a traveling salesman over a designated territory in Texas, which included the city of Palestine, selling baking powders to wholesale and retail dealers. Under his contract it was his duty to go from town to town in his territory and take orders for the baking powders. He used his own car as a means of transportation for which he was allowed the sum of $5 a day for each day it was so used. September 9, 1922, Burnett being in the city of Palestine, for the purpose of calling on dealers in said city to take orders for said baking powders, at an early hour, before the hour of beginning work as a salesman, he took his shotgun in his automobile and went to the country to shoot doves. He returned about 8 o'clock and immediately began calling on the dealers in baking powders in said city, in the usual course of his employment, carrying the shotgun in the back part of his automobile. This he continued until the noon hour. He resided in the city, and drove to his home for lunch, and put the car containing the shotgun in his garage.

On that day he had orders from his employer to finish canvassing the city, and take the afternoon train out for the city of San Antonio, where on the next day he was to begin work in that territory. The afternoon train was to leave at about 1:30 but was not on time. After eating his lunch, it was necessary, under his orders, and for the closing up of his employer's business in the city, for him to call upon the Moore Wholesale Grocery Company in said city before leaving for San Antonio. After lunch he packed his traveling bags preparatory to the trip, and

left the traveling bags in the living room of his home, telling his wife to deliver them to him in front of the house when he drove to the front after getting his car out of the garage. He went to the garage, got in the car, forgetting that the gun was still in the car, and was leaving the garage when he discovered the gun. Stepping to the running board of the car he took hold of the barrel of the gun with his left hand, intending to remove the gun and leave it in the garage, and while so holding the gun, the car being in motion, the gun was discharged, resulting in injury to his left hand which necessitated its amputation at the wrist. At the time of the injury, he was in his car starting on his way to call on the grocery company in the usual course of his employment to solicit orders for baking powders in the furtherance of his employer's business.

It was the holding of the Supreme Court that the purpose of Burnett in having the gun in the car had to do only with his dove hunting. That it had nothing to do with, and was an incident apart from, any work he was doing for his employer. That it did not originate in the work to be done, nor in the manner of doing same. Neither did the injury caused by his attempt to remove the gun result from any risk incident to the business of selling baking powders.

In the instant case Harbuck's stopping at the hotel was a necessary element in performing his duty to his employer, and understood as a part of the manner in which the work was to be done, and agreed to and paid for by the employer. The facts as to how and why the injuries occurred are entirely different in the two cases. There is no conflict here with a holding in that case.

All the authorities cited by appellant have had our careful consideration, but it is not believed that any of them, on the facts, require a different holding in the instant case.

Appellant's fourth assignment asserts that the statements made by Harbuck after he was injured to the effect that he was trying to save certain effects of his employer, and that such delayed his escape from the hotel, thereby necessitating his jumping from the window, was inadmissible, being hearsay, and self-serving declarations, and the narrative of a past event, and should not have been considered by the court, in the absence of which the appellant contends the record "is utterly lacking as to any evidence showing" that Harbuck was performing any duty in the course of his employment where-fore the judgment in favor of appellees was in error.

This assignment is overruled. The fire occurred at about 2:30 at night. J. K. Bennett testified, in substance, that he lived within about 300 feet of the hotel. That he was aroused by the noise being made, that he went to the fire not more than fifteen minutes afterwards. That upon approaching the fire he observed Harbuck crouched against a fence dressed in his pajamas with his overcoat thrown around him, moaning and in a dazed condition. That in "just a second or two" he got Harbuck into an automobile and carried him to his, witness', house and immediately phoned Dr. McCreight, who lived "several blocks away," who arrived in about fifteen minutes and at once administered to Harbuck. That when the doctor arrived, and before, Harbuck was suffering intensely, but was wholly conscious. The doctor gave him a hypodermic of morphine and taped his back which slightly relieved his pain.

Dr. McCreight testified that he reached Harbuck in about fifteen minutes after he was called, and found him suffering intensely. That he gave him a hypodermic of morphine and taped his back, which slightly relieved his pain. He said that Harbuck told him that he, Harbuck, was working for the Stanard-Tilton Milling Company of Dallas, and was there to see T. S. Wright and T. B. Taylor, merchants. That he saw Taylor, but did not get to see Wright and stayed over to see him the next morning. That he woke up to find the hotel on fire and that he opened the door of his room and the flames rushed in and he had to shut the door. That he had to go out at the window to escape burning. That he was delayed in getting out because he was trying to find his traveling case, but it being dark he failed to find it. Other testimony showed the case to contain, among other things, the blank orders, order book, samples of goods, and reports of collections, weekly route copy, etc., also Harbuck had expense money and a check for $28 payable to the milling company, all of which was burned, as was the automobile in which he traveled belonging to the company. Bennett was present and heard the statement made by Harbuck to Dr. McCreight. He so testified.

The doctor stayed with Harbuck about thirty minutes, and then went to see another patient. He was gone about thirty minutes and returned to see Harbuck and found him still suffering intensely. He administered to him again, and Harbuck again made to him

in substance the same statement as before, somewhat enlarging it.

We think there can be no question of the admissibility of the statement first made. It was made within about thirty minutes after Harbuck was picked up from the ground at the fire, and about 300 feet of the place where the hotel was burning and where he was found. He at the time was suffering from intense pain caused by the fall. It was a statement as to the cause of his injury springing out of the occurrence, and under circumstances which show that it was not prompted by any intention to misrepresent the truth. International & G. N. Railway v. Anderson, 82 Tex. 516, 519, 17 S. W. 1039, 27 Am. St. Rep. 902; Railway v. Robertson, 82 Tex. 657, 17 S. W. 1041, 27 Am. St. Rep. 929; San Antonio & A. P. Railway v. Gray, 95 Tex. 424, 67 S. W. 763; Southern Casualty Co. v. Hernandez (Tex. Civ. App.) 297 S. W. 544; 17 Tex. Jur. 642, § 270. If it should be said that the second statement made by Harbuck to Dr. McCreight, some thirty minutes later, was not admissible, its admission was harmless for it was but the repetition, substantially, of the first statement. Moreover, if both statements were discarded, or had not been admitted, still the undisputed facts otherwise appearing fully warranted the judgment awarding compensation.

The assignment against the judgment for a lump sum is overruled. The evidence amply supports the finding.

The judgment should be affirmed, and it is so ordered.

Affirmed.