## SAFETY CASUALTY CO. v. WRIGHT et al.

### No. 3659.

Court of Civil Appeals of Texas. Beaumont.

April 27, 1940.

Rehearing Denied May 29, 1940.

McComb & Davis, of Conroe, and Vinson, Elkins, Weems & Francis and C. M. Hightower, all of Houston, for appellant.

Campbell & Foreman, of Livingston, and Pitts & Liles, of Conroe, for appellees.

O'QUINN, Justice:

This is a workmen's compensation case. Magnolia Pipe Line Company was the employer; Valentine C. Wright was the employee; and Safety Casualty Company the compensation insurance carrier. On July 21, 1938, while engaged in his employment (as alleged and contended by appellees) as an employee of said Magnolia Pipe Line Company, Valentine C. Wright received an injury resulting in his death. Mrs. Daisy Wright, wife of Valentine C. Wright, deceased, individually, and as next friend for Edna Wright, Floyd Carter Wright, and Calude Elton Wright, minor children of Mrs. Daisy Wright and her deceased husband, Valentine C. Wright, duly filed claim for compensation with the Industrial Accident Board. On February 23, 1939, the Board made its final ruling and award denying claimants compensation. Appellees duly gave notice to the Industrial Accident Board that they would not abide said ruling, and duly filed this suit to set said award aside and to recover compensation.

Appellant answered by general demurrer and general denial.

The case was tried to a jury upon special issues, upon their answers to which judgment was rendered setting aside the award of the Industrial Accident Board, and awarding compensation to appellees for 360 weeks at the rate of $20 per week beginning on July 23, 1938, same to be paid in a lump sum, less legal discount. It appearing that 65 weekly payments had matured it was ordered that same bear interest at the rate of six per cent from date of maturity until paid. As to the 295 unmatured weekly payments, it was adjudged that same should be discounted at the rate of six per cent for present payment, amounting to $5,021.15, which said sum should bear interest at the rate of six per cent from the date of judgment until paid, and judgment in favor of appellees for all of said amounts, one-third of which recovery to be paid to the attorneys representing appellees.

Appellant's brief contains five assignments of error upon which it presents three propositions. The first two urge that under the undisputed evidence at the time deceased received his fatal injuries he was not performing any duties in the course of his employment, and so his death was not compensable.

The evidence is practically without dispute. The Magnolia Pipe Line Company owned and operated an oil pipe line a portion of which passed through the territory lying between the City of Conroe in Montgomery County, Texas, and the Trinity River to the northeast. Deceased, Valentine C. Wright, was employed as a line walker to look after this portion (from the Trinity River to Conroe) of its pipe line. It was his duty to walk over this section of the pipe line, a distance of some 52 miles once each week. He was required to take with him a shovel, hammer and chisel so that he could make repairs on the line if necessary. He resided at Cleveland which was situated near the middle of the section over which he walked. There was a station at Cleveland from which he departed in the mornings when he left to go over the pipe line, and to which (as contended by appellees) he would return in the afternoon and make his daily report. He usually started out about 6 in the morning, and did so on the day he was injured. His employer did not furnish him any means of travel. He was allowed to use his own car, walk, catch a ride, or ride the public bus that ran for quite a distance parallel and near to the pipe line. That he used these means of travel was known to and approved by his employer, Magnolia Pipe Line Company. Also the pipe line company not only knew of his riding the bus as a necessary convenience in getting to and over the section of the pipe line he must travel, and did not object, but assisted him in getting a pass on which to ride the bus. He was also allowed the sum of $15 per month extra for expenses in making his daily rounds and reports. On the day that he was injured, July 21, 1938, he proceeded to go over the pipe line until he reached Conroe, and there decided to ride the bus back toward Cleveland to a point some three or four miles out from Cleveland when he intended to get off of the bus and walk over the pipe line three or four miles to Cleveland, he not having gone over that particular space that morning, and after arriving at Cleveland he, as usual (as contended by appellees), would go to the station and make his daily report. When some half way between Conroe and Cleveland on his return, something happened to the machinery of the bus and it would not run. The bus driver got out to see what was the matter and found that the battery of the bus had broken loose and fallen down breaking the gas line, and the gasoline was escaping. He attempted to stop the escape of the gasoline with a wooden plug. Wright had gotten out and in attempting to aid the driver in stopping or plugging the gas line got gasoline on his clothes, and the gasoline exploded setting Wright on fire, from which he was so badly burned that he died two days later. The gasoline tank was at the rear of the bus and the gasoline in the tank drained through the gas line from the tank to the motor in front. Lawrence Pate, the driver of the bus, testified that the gas line was broken at about its middle, and that in attempting to plug it he got under the bus and was trying to stop the flow of the gasoline with a wooden stopper; that Wright offered to assist him and that he, Wright, got under the bus and placed the wooden stopper in the broken gas line and told him to get Wright's hammer in the bus for Wright to drive the stopper tight; that he did so and Wright drove the plug; that Wright had gotten gasoline in his clothes while under the bus, and that after Wright got out from under the bus he, Wright, struck a match to light his pipe and the gas exploded and that was the way Wright's clothes became ignited.

As we understand the record, Wright had a distance of 52 miles of pipe line to walk every week. He was not required to walk the line from Cleveland to Conroe, some 24 miles, and then return to Cleveland re-walking the line. He had to return to Cleveland so that he could then walk the line from Cleveland north to the Trinity River. He must then return to Cleveland, but did not have to re-walk the line to Cleveland. After returning from the Trinity River to Cleveland, he then again started from Cleveland to Conroe over the line. His employer, the Magnolia Pipe Line Company, did not furnish Wright with any sort of transportation in making the distances and return, but did pay him $15 per month for expenses incurred in the work. It was not any part of the monthly salary contracted to be paid. Wright walked the line, sometimes rode horseback over the line, sometimes used his own car in getting over the line where it could be used, which the record reflects was at different places for several miles in a stretch, and also rode the public bus that covered the distance from Conroe to Cleveland. Highway 105 ran near to and practically parallel with the pipe line for a great part of the distance between Cleveland and Conroe; in fact the pipe line traversed portions on both sides of the railway line and Highway between Conroe and Cleveland. These methods of getting over his territory by Wright were known to the Magnolia Pipe Line Company, and it did not object at any time or in any way to his using these means. It appears that Wright had a pass giving him the right to ride on the bus. There was a conflict as to whether deceased was required to report to the station at Cleveland of his day's work or walking of the line. Mrs. Wright, and her sister who lived with them at Cleveland for a time, testified that he did make such reports, and the station agent and superintendent testified that no such requirement existed but that reports were required only when leaks in the pipe line occurred. A son, Floyd Wright, twelve years old, testified that during the preceding three or four years he occasionally went with his father over the pipe line and that on evenings when they returned to Cleveland his father went to the station and made out his report and left it with the station operator. Another son, Clifford Wright, 23 years old, testified that he sometimes worked in his father's place walking the pipe line, when his father was on vacation or was sick, and that he worked under the same supervision and regulations as did his father, and that he reported to the station manager in the morning so that the manager, Mr. Dempsey, would know what end of the line he was on, and that on his return he would report to the station, and if leaks were found he made a written report. Dempsey, the manager, denied that he required such report, but that reports were made only in case of leaks found in the line. Also the question of whether deceased was required to hold himself in readiness for a call to duty for the twenty-four hours of the day was disputed. However, it did appear that Wright was frequently called at night to go and assist in repair work on the line. It was in evidence that deceased never stayed away from home at night. He resided very near the station. He had served in the capacity of Line Walker on this particular section of the line for 19 years.

█ Under these facts, considered in connection with the nature of his contract with the pipe line company, we think that Wright was clearly in the discharge of his master's business at the time he received his injuries, and therefore the injuries were sustained in the course of his employment, and so compensable. The length of line he had to cover in serving his employer, 52 miles, and that this must be done one time each week made it impossible for him to make the route in one or even two days. He was placed at Cleveland which was situated about the middle of the line—Trinity River to Conroe. The station with its manager and force was situated at Cleveland. Wright necessarily had to start from Cleveland and walk either north or south and when he had reached the end of his line in either direction, he must of necessity return to Cleveland to make the other end of the line. It is but reasonable to say that in returning from the north or south end of the line to Cleveland to cover the other end, he was but doing the necessary thing in the performance of his contract. His employer did not stipulate the hour when he should start on his route in the mornings, nor the manner or means of his travel, but left him free to arrange these matters for himself. The only requirement in this regard was that he must walk the line one time each week. His hours of service and the method or means of travel were left entirely to his selection. He sometimes walked, some-

times rode a horse, sometimes used his own car on such portions of the line as available, sometimes caught a ride, and sometimes rode the bus running from Conroe to Cleveland. All this was known to his employer, the Magnolia Pipe Line Company. It was some 24 or more miles from Conroe to Cleveland. It could not be expected that Wright, carrying the tools— shovel, hammer and chisel—that was required to be used in repairing leaks in the line, could make that distance in one day. So, he usually walked as far as he could and would then return by walking, or catching a ride when on the north end back to Cleveland for the night. The next day he would go to the place where he stopped the evening before, and return as before. The next day he would start out on the south end, and after reaching the Conroe end of the line, would frequently catch the bus going to Cleveland. This was known to his employer and not objected to. On the day he was injured he commenced walking the line at a point below Cleveland near the San Jacinto River. When he reached Conroe, he caught the bus back to Cleveland, intending to get off of the bus at the point where he began walking the line that morning and walk the line from there back to the station. His work for the day was not finished. When some where about midway from Conroe and Cleveland the bus went dead and stopped. It being necessary for him to get back to the line to walk into Cleveland, he naturally attempted to aid the bus driver in getting the bus to going, and in doing so got gasoline in his clothes and from the striking of a match the gasoline exploded and his clothes ignited burning him so severely that he died the third day thereafter. We think it clear that the presence of deceased on the bus, and his efforts to repair the bus in order that he could reach and complete walking the pipe line as he was required to do, had to do with and was incidental to and arose out of his employment. Not only so, but was a risk or hazard reasonably inherent in and incident to the work or employment Wright was engaged in for his employer. Texas Employers' Ins. Ass'n v. Harbuck, Tex.Civ.App., 73 S.W.2d 113, writ dismissed; Safety Casualty Co. v. Staggs, Tex.Civ.App., 99 S.W.2d 682, writ dismissed; Maryland Casualty Co. v. Boone, Tex.Civ.App., 115 S.W.2d 1130, writ dismissed; Texas Employers' Ins. Ass'n v. Cobb, Tex.Civ.App., 118 S.W.2d 375, writ refused; Traders' & General Ins. Co. v. Nunley, Tex.Civ.App., 80 S.W.2d 383, writ refused; Federal Surety Co. v. Ragle, Tex. Com.App., 40 S.W.2d 63; Petroleum Casualty Co. v. Green, Tex.Civ.App., 11 S.W. 2d 388, writ refused; Kirby Lumber Co. v. Scurlock, 112 Tex. 115, 246 S.W. 76; Watts v. Continental Casualty Co., Tex. Com.App., 18 S.W.2d 591; In re Bollman, 73 Ind.App. 46, 126 N.E. 639; Haddock v. Edgewater Steel Co., 263 Pa. 120, 106 A. 196; State ex rel. McCarthy Bros. Co. v. Dist. Court, 141 Minn. 61, 169 N.W. 274; Consolidated Underwriters v. Breedlove, 114 Tex. 172, 265 S.W. 128; Employers' Liability Assurance Corporation v. Light, Tex.Civ.App., 275 S.W. 685, writ refused.

We do not think it necessary to quote from the cited authorities, but deem it sufficient to say that, in our opinion, they abundantly support our holding.

■ Appellant's third proposition complains of improper argument by counsel for appellee in closing the argument to the jury. As reflected by the bill of exceptions the argument was:

"Lets see about Jim Sanders. He said Jim Sanders has been on juries from time to time. Was Jim Sanders trying to do something unlawful? No. Could he have sat on this jury? He was honest enough to say, 'I know too much about it. Let me off.' If Jim Sanders is not the kind of a man the jury can believe, then Camy Hightower (of counsel for appellant) you could have put somebody on the stand that would testify he can't be believed.

"You go to messing with these railroads and insurance companies and these big corporations and I be darned if they don't smoke you out of the country if you don't fight them from day light to dark.

"They even brought a man that went to work in October. He didn't testify, but he was willing."

In order that the matter can be understood, a brief statement of certain matters should be stated. Sanders was a member of the venire summoned to try the case. On his voir dire he disqualified because of his having an opinion that might influence him in arriving at a verdict. Later he was used by appellee as a witness for impeaching purposes, and on cross examination he was subjected to a very thorough and searching questioning. Among other things he was asked whether he had frequently sat on juries where Pitts and Liles (a

firm of lawyers residing at Conroe, and of counsel for appellee) were attorneys in the case; whether he had been picked up on juries where Pitts and Liles were attorneys in the case; if he had not worked on the evidence in cases where Pitts and Liles were attorneys, all of which Sanders denied. The first portion of the argument objected to seems to have applied to the foregoing. Relative to the second part, these facts appeared: The Magnolia Pipe Line Company was the employer. It carried compensation insurance with appellant covering its employees. It was not a party to the suit. J. H. Joy, who resided in Houston, was District Superintendent of the pipe line company and deceased was under his jurisdiction or supervision. Appellees invoked the rule at the commencement of the trial. At the request of appellant, over the objection of appellees, Joy was excused from the rule and remained in the court room during the trial and assisted counsel for appellant in the trial. He also testified for appellant, and, accompanied by H. D. Wade, Chief engineer of the pipe line company, went out into the country some nine miles and brought in another pipe line walker of appellant, George Gilmore, and he was used as a witness for appellant. It is presumed that the second portion of argument by counsel for appellees complained of had reference to these acts of the employer of deceased. These activities of the employer, though not a party to the suit, evidenced quite an interest adverse to appellees, and were not in defense of any claim against it. We are inclined to think the argument was not improper. But if objectionable, it was not of such nature as that an instruction from the court would not have removed the harmful effect, if any, had an objection been made at the time. The objection to the argument was made for the first time in appellant's motion for a new trial. If the objection had been made at the time of the argument it would have given the court the opportunity, if he thought proper, to have instructed the jury to disregard the argument, and we find nothing in the record to indicate such instruction would not have been fully obeyed by the jury. Decatur Cotton Seed Oil Co. v. Taylor, Tex.Civ.App., 182 S.W. 401, writ refused; Southern Old Line Life Ins. Co. v. Mims, Tex.Civ.App., 101 S.W.2d 396; Geistmann v. Schkade, Tex.Civ.App., 121 S.W.2d 494; Ramirez v. Acker, 138 S.W.2d 1054, not yet reported [in state report]—decided by Supreme Court, April 17, 1940.

Finding no reversible error, the judgment is affirmed.

## On Motion for Rehearing and Additional Findings of Fact.

The record reflects and we find:

(1) That the accident happened on Thursday about 3 o'clock in the afternoon and from the point where deceased intended to get off of the bus and walk the line to the Magnolia pump station at Cleveland, Texas, was a distance of some 3 or 4 miles. Under deceased's contract of employment he was not required to walk this portion of the pipe line that afternoon, but could have walked it the next day, Friday, or on Saturday, because he had walked the east end from Cleveland to the Trinity River the first part of the week. With the exception of this portion of the line deceased's entire section of 52 miles had been covered that week.

(2) The Magnolia Pipe Line Company did not require deceased to return to Cleveland at the end of each day, but he was privileged to spend the nights away from home, and had spent the nights at Trinity River (the terminus of the east end of his line) and at Conroe (the terminus of the west end of the line). However he was frequently called out at night to assist in emergency repairs on the line, and as he resided at Cleveland, which was near the middle of the section of line he had to cover, and lived near the pipe line station he practically all of the time returned to his home at Cleveland to be on hand if called suddenly for extra services. This was known by the agent at Cleveland. The times he spent the night at the river or at Conroe were during the first four years of his service when he rode horseback over the line—he had been constantly performing this service for nineteen years.

(3) The bus which deceased was riding when he was injured was owned by one C. D. Thomas. Lawrence Pate was the driver and it was his duty to keep the bus in repair. The Magnolia Pipe Line Company had no interest in or control over the bus, or its operation, and the company did not require deceased to assist in repairing it, but the company did know that deceased used the bus in the discharge of his duties to the company, and made no objections to

such use. It left deceased free to arrange his schedule of walking the pipe line, and free to choose his methods in getting over the line. The injury occurred on Highway No. 105 which ran near to and practically parallel with the pipe line for a great part of the distance between Conroe and Cleveland. The accident was at a point on the highway some 11 miles from the place where deceased intended to get off of the bus and resume walking the pipe line back to Cleveland.

We think all the above findings of fact are substantially embodied in our original opinion, but that they may clearly appear, we add them to our opinion. With this exception, the motion for a new trial is overruled.