# Standard Oil Co. (Kentucky) v. Witt et al.

May 28, 1940.

Eugene Hubbard, Judge.

Crawford, Middleton, Milner & Seelbach and J. Donald Dinning for appellant.

Selligman, Goldsmith, Everhart & Greenebaum for appellees.

OPINION OF THE COURT BY JUDGE CAMMACK—Affirming.

Leonard H. Witt, an employee of the Standard Oil Company of Kentucky, came to his death in Barbourville at about 4 a. m., Monday, January 10, 1938, as a result of burns received when the building in which he was spending the night was partially destroyed by fire of unknown origin. The appellant, widow and sole dependent of decedent, made claim for death benefits with the Workmen's Compensation Board. The case was submitted to a referee on an agreed statement of facts. The Board found for Mrs. Witt, and on appeal by the company for a full Board review the Board affirmed the

award and adopted the opinion of the referee as its own. The company appealed to the circuit court and that court affirmed the action of the Board; hence this appeal.

Since the sole question presented is whether Witt's death resulted from an accident arising out of and in the course of his employment, we deem it advisable, even though it will lengthen this opinion somewhat to quote the principal parts of the stipulation:

"(A) Leonard H. Witt, hereinafter referred to as 'decedent,' was in the general employ of the defendant, Standard Oil Company, hereafter referred to as the 'Company,' as a construction foreman, working under the direction and supervision of the Company's Construction Superintendent, W. H. Sallee, whose office was in Louisville, Kentucky, which city was the headquarters and home of decedent at all times herein referred to.

"(b) Compensation paid decedent by the Company was a monthly salary of $150.00, payable twice a month, one-half on the 15th of the month and one-half on the last day of the month. In addition to said salary, the Company made decedent an allowance of $2.50 per day to cover the expense of his room and board when he was away from Louisville on Company business. The Company provided decedent with a Company automobile and with tools, which tools he carried about with him in said automobile. Said automobile and tools were provided decedent for business use and the Company furnished him its own gasoline and oil without any cost to him and reimbursed him for all other operating expenses of said automobile.

"Decedent was employed by the Company to work on the basis of eight hours a day, five days a week, or forty hours a week. However, in the case of the decedent, who was a key man, and who worked principally on construction projects outside of Louisville, this schedule was not adhered to either by the Company or by decedent, and decedent could perform his work during such hours as he chose, but was expected to expend as much time as the project in hand required. In any emergency, whether during or after regular hours, he was ex-

pected to put in as much of his time and attention as the situation required and even apart from emergencies he occasionally worked overtime and on Sunday in the interests and upon the business of the Company. The greater part of decedent's time was spent on the Company's business outside of Louisville, and on infrequent occasions when it was feasible for him to do so decedent would return to Louisville on Friday so he could go to the Company's plant Saturday morning and there make whatever reports and have whatever conferences were necessary. When decedent would so return to Louisville on Friday evening he would leave again on Sunday so that he would be on location Monday morning to start work.

"While decedent may have had no routine work to do on Saturday or Sunday, as above stated, his business was of such nature that it required his being away from home many weekends during the year on projects of the Company located outside the City of Louisville where decedent resided. When at work on such projects decedent could return to Louisville over the weekends if desired, or he could remain at the location, in his discretion. When decedent stayed away from Louisville over the weekends and even though he did no work for the Company on Saturday or Sunday, the Company made decedent the above referred to usual allowance of $2.50 per day for board and lodging over Saturdays and Sundays.

"At all times when the decedent was out of Louisville on Company business the Company was in touch with him through the resident agent at the place where the particular project was in progress, and at all times he was subject to the Company's call. Decedent's family was able to get information as to his precise whereabouts through the Company.

"Regardless of the forty hour weekly basis above referred to, decedent had no stated or definite hours of work each day and in the event of any necessity or emergency was, even after the regular hours as aforesaid, subject to the Company's call at any time.

"(c) The parties had elected to operate and were operating under the provisions of the Workmen's Compensation Act of Kentucky, and decedent had signed the Company's Compensation Register. * * *"

"V. The facts known to either of the parties hereto as to the circumstances of decedent's presence in Barbourville, Kentucky, on the occasion when he met his death on January 10, 1938, are as follows:—

"(a) Construction projects for the Company were in progress at Carrollton, Kentucky, and at Corbin, Kentucky, on January 10, 1938. At Corbin, the Company was constructing a garage at its bulk plant there located. There was no construction work for the Company in progress at Barbourville, Kentucky. On the evening of Wednesday, January 5, 1938, decedent was in Louisville, at home, and his superior, Mr. Sallee, came to decedent's house and went over with him certain blueprints for work to be done at Corbin, Kentucky. The question arose as to procuring some lumber needed for the job at Corbin and decedent told Mr. Sallee he could buy the lumber in Corbin or some other place in that vicinity cheaper than at any other place. The actual decision of where, when, and from whom to make such purchases was left to the discretion of decedent. Decedent left Louisville Thursday, January 6, 1938, and went to Carrollton to do some work in connection with a project of the Company which had just been finished there. He stated that he intended to go direct from Carrollton to Corbin. Decedent's going to Carrollton and Corbin were with the full knowledge and consent and under the direction of the Company.

"It was understood by the Company that when a convenient opportunity presented itself and when it would not interfere with his work at Corbin, decedent would proceed to the Company's property at Pineville, Kentucky, to put some new flues on a boiler located there. Barbourville is sixteen miles from Corbin and Pineville is twenty miles from Barbourville and all of said towns are on U. S.

Highway 25. In going from Louisville or from Carrollton over the customary route Corbin will be reached first, Barbourville next and Pineville last, it not being necessary to pass through Barbourville to reach Corbin either from Carrollton or from Louisville, but it being necessary to pass through Barbourville to reach Pineville either from Carrollton or from Louisville.

"(b) While away from Louisville it was necessary that decedent stay at hotels and since the nature of his employment often required that he be away from home for days and sometimes weeks without returning, on such protracted absences from Louisville decedent would, and was necessarily required to, procure lodging at the place or places where his duties required him to be.

"(c) On January 10, 1938, the Company was not engaged in work in Barbourville and the project upon which decedent was then working was at Corbin, Kentucky, where the work crew was situated. However, decedent was under no specific orders to remain or be in Corbin on said occasion. Officers of the Company and persons in authority over decedent have learned since January 10, 1938 (although they did not have such knowledge prior to that time) that for approximately ten years next preceding that date, decedent made his temporary headquarters in Barbourville when he had work to do for the Company in that general section of Kentucky and that when in Barbourville decedent occupied a room or rooms in a boarding house or hotel known as the Mitchell Tourist Home where he paid regular charges for room and board. This selection of his temporary abode in that section of the State was a matter entirely in the discretion of the decedent and was not at the suggestion or direction of the Company, nor did the Company object to that choice, but the choice of such place of temporary abode was a matter of decedent's own preference as a place to stop when required by his duties to be in the vicinity of Barbourville.

"(d) On Friday, January 7, 1938, decedent is known to have been in Barbourville. He was at the Company's plant in Barbourville at about 11 A. M.

January 7. He sat around the plant about an hour and chatted with the Company's agent, but is not known to have transacted any business for the Company. No business matters were discussed between decedent and the Company's agent, or between decedent and anyone else for and on behalf of the Company, so far as the parties are advised. Decedent is known to have attended a picture show in Barbourville, Friday night, January 7.

"(e) Saturday morning, January 8, decedent is known to have visited a shoe shop in Barbourville and had a pair of shoes repaired and is known to have gone to a barber shop and obtained a shave. Between 1 and 2 o'clock P. M. on Saturday, January 8, 1938, decedent is known to have called at the Vial Lumber Yard and to have asked the proprietor if he had any two-inch oak lumber and if he would make delivery at Corbin, Kentucky. Such inquiry for lumber related to lumber to be used in the construction of the Company's project at Corbin. The proprietor answered in the affirmative, and inquired how much lumber decedent wanted, to which decedent replied that he did not have his list made up and that he (decedent) would see him (proprietor) again the following week. No other conversation of business nature was had between decedent and the proprietor of said Vial Lumber Yard, or anyone else, known to the parties. No actual purchase was made and no agreement or contract was entered into for the purchase or delivery of any merchandise. No lumber was purchased from the Vial Lumber Company subsequently by the Company, and the conversation above mentioned did not result in any business transaction between said Lumber Company and the Company. On Saturday night, January 8, 1938, decedent is known to have attended a picture show in Barbourville.

"(f) On Sunday, January 9, 1938, decedent followed the usual Sunday routing and no business is known by the parties to have been transacted by him that day on behalf of the Company. He is known to have retired to his room at the Mitchell Tourist Home at about 7 P. M. The Company's automobile, which decedent was using, was parked on the street outside of the Mitchell Tourist Home

overnight and in it were the tools which the Company furnished for his use in connection with his employment.

"(g) On Monday morning, January 10, 1938, a fire was discovered at the Mitchell Tourist Home at about 4:30 o'clock. The occupants of the house at that time were the proprietress, her niece, and another roomer, all of whom escaped from the burning building with safety. The fire appeared to originate in the room occupied by decedent. When his body was found, it was on a small screened porch just off the room adjoining the one decedent had occupied during the night, and was clad only in his sleeping garments. A steamer trunk, the property of decedent, was found on the bed in the adjoining room through which he had passed on his way to the porch. Found in his room in a damaged condition were his personal effects, such as a few clothes, a time book used on the Company's business, some Company correspondence, his watch, spectacle case, a small amount of pocket change and his pocket knife.

"Decedent's presence was required in Corbin Monday, January 10, 1938. Corbin is 185 miles from Louisville by the most direct route."

In insisting that Witt's death did not even occur in the course of his employment the company points out that (1) his employment did not require him to remain away from his Louisville home over the week-end; (2) Barbourville was not even the place the company could have reasonably expected Witt to have remained over the week-end if he had elected not to return to his home in Louisville; and (3) the Mitchell Tourist Home in Barbourville was Witt's temporary place of abode by choice. It is our conclusion, however, that the facts set forth in the foregoing stipulation leave no doubt that Witt met his death in the course of his employment.

The facts and circumstances in this case are materially different from those in the case of Scott Tobacco Company v. Cooper, 258 Ky. 795, 81 S. W. (2d) 588. In that case Cooper, a traveling salesman, had gone from his home in Ashland to Paintsville on Sunday. While returning from a restaurant on Sunday afternoon he was struck in the eye by a piece of gravel thrown by

a passing automobile. It was held that the accident was not one arising out of and in the course of Cooper's employment. It was pointed out in the opinion that the accident occurred on the Sabbath when there existed no contract for service, and was not one where the employee was injured in going to and from his place of work. It was further pointed out that Cooper had completed his trip from Ashland to Paintsville with safety and that he had come to a state of rest until the beginning of the performance of duties for his master the next day, and as indicated it was held that the accident was one that neither arose out of nor in the course of Cooper's employment. In the case at bar there can be no question as to the accident in which Witt met his death occurring in the course of his employment, and as will be pointed out hereinafter it was one which might reasonably have been anticipated as an incident to his work and as having a causal connection therewith.

It was pointed out in the case of January Wood Company v. Schumacher, 231 Ky. 705, 22 S. W. (2d) 117, 119, that:

"The fundamental principle of liability, it seems to us, is that the injury sustained was such as in the light of experience might reasonably have been foreseen as a result of the service and nature of duties performed (28 R. C. L. 786, 805), or the cause must have had its origin in a risk connected with the employment and the injury have flowed from that source as a rational consequence. In re McNicol [215 Mass. 497, 102 N. E. 697, L. R. A. 1916A, 306], supra. In Palmer v. Main, 209 Ky. 226, 272 S. W. 736, 738, the court thus generally stated the rule: 'We have therefore reached the conclusion that an accident arises out of the employment within the meaning of the Workmen's Compensation Act if it was the direct and natural result of a risk reasonably incident to the employment in which the injured person was engaged, and many courts take the same view of the question.' "

In the recent case of Lexington Railway System v. True, 276 Ky. 446, 124 S. W. (2d) 467, 468, in which reference is made to the Schumacher case, supra, and a number of other domestic and foreign cases, it is said:

"To be within the Compensation Act by virtue of

this provision, the accident must be one 'arising out of his employment' and must have had its origin in some risk of the employment. There must be a causal relation between the employment and the accident. It is not enough that the injured person was at the place of the accident because of his employment unless the injury is the result of some risk peculiar to the employment. The injury must be incidental to the nature of the employment. If the injury occurred by reason of some cause having no relation to the employment, it cannot be said to 'arise out of the employment.' [Citing cases.]''

In the Schumacher case the employee was a night watchman. He was killed by his wife's lover while on duty, and it was properly held that his death did not arise out of his employment. Compensation was denied also in the True case. In that case a streetcar motorman was accidentally killed by a bullet from a .22 rifle which had been recklessly discharged by a boy some 50 or 60 feet from the street along which the car was traveling. While the motorman met his death during the course of his employment, it was properly held that the accident was not one which could have been reasonably anticipated as a natural consequence of, or having a causal connection with, his work. It was pointed out in the opinion that such an accident was less likely to happen in the place where the motorman's duties required him to be than in many other places. Compensation was denied also in the recent cases of Meem Haskins Coal Co. v. Jent, 269 Ky. 716, 108 S. W. (2d) 726; Meem-Haskins Coal Corporation v. Bach, 278 Ky. 535, 128 S. W. (2d) 913; but an examination of those cases will reveal circumstances materially different from those in the case at bar.

After quoting a substantial part of the foregoing stipulation, the referee analyzed the general conditions and circumstances under which Witt performed his work, and referred to several cases dealing with the question at hand, and then concluded with the two following paragraphs:

"It is true that decedent, at the time of the accident that resulted in the loss of his life, was not engaged in any actual work for the Company, but he was in his room, a room paid for by his employ-

er, where he was reasonably expected to be at the time of the accident. He was at the place where his employer could communicate with him in the event it desired to do so.

"It was certainly and necessarily in the contemplation of the parties, employer and employee, that there would be periods of rest and sleep as essential incidents of the employment, and this is evidenced by the fact that the Company advanced decedent money for room and board, but there was no break in the continuity of his employment while he was in his room as he was subject to call at any time. And if the Company had called for him at that particular hour, 4:30 A. M., it would have reasonably expected to find him in his room at the hotel. There was a definite causal connection between the accident that resulted in death and the employment, and the risk of the accident was reasonably incident to the employment and the conditions under which it was to be performed. We therefore find, under the agreed stipulation of facts, as matter of law, that the accidental injuries sustained by decedent in the fire that broke out in the Mitchell Tourist Home, and which resulted in the loss of his life, arose out of and in the course of decedent's employment."

The question is, does the record as heretofore reviewed support the Board's finding that the accident resulting in Witt's death was one arising out of and in the course of his employment? We think it does. Witt met his death during the course of his employment. That is clear. His employment was such that he was required to spend considerable time away from home. Provision was made for him to stay in hotels when away from home, though only $2.50 per day was allowed for his meals and his lodging. While the selection of his stopping places was left to him, it was known that certain risks were necessarily involved in his stopping at small town and inexpensive hotels. He was subject to call at all times and when he met his death he was at a place where he was expected and required to be by the nature of his employment. While hotel fires may be infrequent, so are many peculiar accidents in which workers receive compensable injuries. Certainly Witt's employment

subjected him to risks greater than those to which the general public is ordinarily subjected.

The recent case of Employers' Liability Assurance Corporation v. Warren, 172 Tenn. 403, 112 S. W. (2d) 837, 841, is somewhat similar to the case at bar. In that case Warren, a resident of Kentucky, and an employee of a Kentucky insurance company, was working under a contract of employment made in this state. He sustained injuries when he fell from a hotel porch during the evening and while he was returning to his room after reading a magazine. The injuries resulted in his death and compensation was allowed under the Kentucky Statutes. Warren was required to travel in the state of Tennessee and was obliged to stop at hotels and at the time of the accident was waiting for the arrival of a local agent to assist him in making out report slips on property which had been inspected by them during the day. During the course of an interesting discussion of the case in which a number of Tennessee cases and those from other jurisdictions are cited, it was said in the opinion:

"* * * Warren was away from his home on a mission wholly in behalf of and under the direction of his employer, and the risks incident to his journey, including natural and usual suspension of actual work, were within the protection of the Compensation Act. * * *"

See, also, the case of Texas Employers' Ins. Ass'n v. Harbuck, Tex. Civ. App., 73 S. W. (2d) 113.

Wherefore, for the reasons set out above, the judgment is affirmed.

Whole Court sitting except Judge Rees.